UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

RONALD R.,

                Plaintiff,

     v.

FRANK BISIGNANO,[1]
Commissioner of Social Security,

                Defendant.

**DECISION AND ORDER**
23-CV-502-A

      Plaintiff Ronald R. brings this action against the Commissioner of Social Security (hereinafter the "Commissioner"), seeking review of the Commissioner's determination denying Plaintiff Social Security Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) under the Social Security Act. Plaintiff (Dkt. #6) and the Commissioner (Dkt. #11) have filed cross-motions for judgment on the pleadings.

      For reasons set forth below, the Plaintiff's motion is **GRANTED,** to the extent that this matter is remanded to the Commissioner for further administrative proceedings consistent with this Decision and Order. The Commissioner's motion is **DENIED**.

---

[1] On May 7, 2025, Frank Bisignano was sworn in as the Commissioner of Social Security.  He is substituted pursuant to Fed. R. Civ. P. 25(d). The Clerk is directed to amend the caption to comply with this substitution.

## I.    BACKGROUND

### A. Procedural Background

On November 5, 2019, Plaintiff (DOB: 8/10/1974) filed applications for DIB and SSI, alleging disabilities that commenced on November 5, 2018. T. 144, 361.[2]  Plaintiff initially alleged disability based upon injuries and "2 screws in [his] right knee, 2 plates in [his] right arm, a dislocated right shoulder, 16 screws in [his] right forearm, [and] deaf[ness] in right ear." T. 364.  Later, in February 2020, during an internal medicine consultative examination, Plaintiff also alleged asthma. T. 471-474.  Plaintiff's claim was initially denied on March 3, 2020, and upon reconsideration on July 23, 2020. T. 167, 189.

On September 5, 2020, Plaintiff filed a hearing request (T. 213), and on January 18, 2022, a hearing was conducted before Administrative Law Judge ("ALJ") Jason Miller. T. 19-60.  Plaintiff, who was represented by counsel, appeared and testified at that hearing, as did vocational expert Amy Leopold. On February 10, 2022, the ALJ issued a decision denying Plaintiff benefits. T. 141-164. On April 12, 2023, the Appeals Council denied

---

[2] References herein preceded by "T" are to consecutively paginated, Bates-stamped pages within the administrative transcript of official proceedings in this case, set forth as Dkt. #5 on the Docket.

Plaintiff's request for review and as a result, the ALJ's decision became the Commissioner's decision. T. 1-5.  Thereafter, Plaintiff commenced this action.

### B. Factual Background

Plaintiff, who testified that he was 47 years of age at the time of his hearing, failed to complete high school and last worked as a chef. T. 28, 30-31.  He reported that he stopped working because he was no longer able to perform his duties or stay on task and because he was too slow. T. 31. In his 2019 applications for DIB and SSI, Plaintiff cited physical limitations associated with, *inter alia*, a dislocated shoulder, screws that he has in his right knee, and screws and plates that he has in his right forearm. T.364, 31-32.  Plaintiff testified that his arms would give out and he had difficulty standing. T. 31-32.  Distinct from those injuries, however, were injuries Plaintiff subsequently sustained to his right ankle and foot when, on October 2, 2021, he was hit by a motor vehicle while riding his bike. T. 31-34, 1144-1218.  As a result of that accident, Plaintiff sustained an open fracture to his ankle with a partially extruded talus bone and broken bones in both feet. T. 1158, 1192.  Such injuries—which occurred after the administrative denial of Plaintiff's claims in 2020 but prior to the January 2022, hearing before the ALJ—were discussed by the ALJ at both the

hearing, *see*, T. 30-35, and in his written decision denying Plaintiff's claim. T. 148-149.

### 1.    <u>Plaintiff's Pre-Accident Medical History</u>:

### a.  Plaintiff's Mental Health

Plaintiff began treating at UBMD Family Medicine at BestSelf Behavioral Health ("UBMD/BestSelf") in December 2019. T. 491, 537-38. He reported suffering from depression, loss of interest, sleep problems, guilt and difficulty focusing, T. 622, and was diagnosed with PTSD, alcohol use disorder, cannabis use disorder, and tobacco use disorder. T. 491. Initial examination was normal except for impaired judgment and fair insight. T. 629. On January 28, 2020, he followed up for counseling and expressed a desire to work on his mental health. T. 500. He underwent a psychiatric evaluation on March 4, 2020, reporting depression, anxiety, and poor sleep. T. 664.  He reported past trauma including previously being shot, as well as being homeless and held captive. T. 664. He noted intrusive memories and flashbacks, anger problems, transient suicidal ideations. T. 664. On examination, Plaintiff's mood was anxious and depressed. T. 667. His attention, concentration, abstract reasoning, insight, and judgment were fair. T. 667-68. Dr. Lauren Derhodge prescribed Prozac and trazodone. T. 669. Plaintiff followed up for group sessions. T. 729, 732.

On March 24, 2020, due to the pandemic, Plaintiff's treatment was changed to remote, and Plaintiff had a medication management follow-up via phone. T. 736. He reported joint pain, T. 736, and during a follow-up visit with Dr. Derhodge in April 2020, he advised that he did not like how trazodone made him feel. T. 741. He noted continued intrusive memories and flashbacks and inquired about medications to help him stop drinking alcohol. T. 741. He remained homeless as well. T. 741. He agreed to start on Naltrexone for his alcohol abuse, and his Prozac was discontinued. T. 743.

On August 11, 2020, during a medication management meeting at UBMD/BestSelf, Plaintiff noted continued pain. T. 761. He remained on naltrexone and was not drinking; however, he admitted to smoking marijuana as it helped with his shoulder pain. T. 761. In counseling, on August 20, he expressed feeling overwhelmed with news reports of people dying. T. 767. He expressed staying away from people, turning off social media, and not answering the phone to "process some of his emotions." T. 767. In counseling on September 23, 2020, he reported increased sadness while thinking about deceased family. T. 786.

During another medication management meeting on October 27, 2020, Plaintiff reported poor sleep due to back pain. T. 799. He remained

on naltrexone and trazodone. T. 801. He also continued methocarbamol, Mobic, ibuprofen, and albuterol. T. 801.

Plaintiff followed up at UBMD/BestSelf for counseling on February 9, 2021. T. 847. It was noted he displayed progress with alcohol. T. 848. Then, in medication management on February 23, 2021, Plaintiff reported interest in medical marijuana. T 850. He still noted low back pain that worsened with standing and walking. T. 850. On March 9, 2021, he noted continued shoulder pain despite an injection. T. 852. On April 20, he noted feeling very moody. T. 855. On May 26 in counseling, Plaintiff reported difficulty after having a lack of engagement with counseling. T. 2004.

### b. Plaintiff's Physical Health

During a medication management follow-up at UBMD/BestSelf in June of 2020, Plaintiff reported pain and dislocation in his right shoulder and right hand being broken. T. 755. He had removed the cast by hand. T. 755. He received ibuprofen and was recommended to follow up with an orthopedist. T. 756. On July 7, 2020, he followed-up again complaining of right hand and left shoulder pain along with numbness, weakness, and tingling. T. 757.  Imaging conducted on Plaintiff's right arm on July 9, 2020, showed fractures with intact hardware and implied healing. T. 527. It was

largely unchanged from a prior study. T.  527. He noted radiating pain that was exacerbated by lying on the left or lifting. T. 1085.  He also noted numbness and tingling. T. 1085.

On July 17, 2020, Plaintiff was evaluated at General Physician PC, Orthopedics, for his left shoulder with multiple dislocations. T. 1078. Plaintiff noted difficulty with reaching and putting on shirt. T. 1078. Meloxicam was prescribed but had not been filled. T. 1078. He continued to report unchanged radiating pain. T. 1087. On examination, he had obvious scapula winging in the left shoulder; reduced range of motion; Hawkins-Kennedy impingement test was positive on the left; Neer Impingement test was moderate positive on the left; Popeye biceps sign is positive bilaterally. T. 1088. Plaintiff received a Medrol injection. T 1089.

On August 25, 2020, at medication management meeting at UBMD/BestSelf, he continued to report pain, numbness, tingling, and weakness. T. 771.  He also experienced a decreased left shoulder range of motion. T. 771.

Plaintiff followed up at orthopedic doctor on September 25, 2020, and reported continued left shoulder pain. T. 1080. An MRI was conducted. T. 1080, 1117, 1124-29. Dr. Lisa Daye reviewed Plaintiff's MRI noting that it

was consistent with chronic recurrent anterior shoulder instability. T. 1091.

Plaintiff had very poor scapular motion and poor strength in the rotator cuff.

T. 1091. Dr. Daye opined Plaintiff was not a surgical candidate because he

was unlikely to improve with surgery. T. 1091.

On November 2, 2020, Plaintiff had an initial physical therapy

evaluation at Sports PT. T. 1020. He reported a prior left shoulder injury

after he fell off a bike. T. 1020. He reported difficulty putting on clothes,

opening jars, reaching forward, reaching overhead, and washing his back.

T. 120. On examination, he had an elevated left collar bone, as well as a

gap between the AC joint due to how his injury healed. T. 1021. There was

tenderness to palpation to the left anterior shoulder. T. 1021. There were

moderate restrictions in the scaleni, levator scapula, latissimus dorsi, upper

trapezius, and the pectoralis minor. T.  1021. Strength was reduced. T.

1021. Sulcus sign was positive, and range of motion was reduced. T. 1021.

Sarah Johnson, a Physical Therapist, noted Plaintiff's impairments were

limited range of motion, abnormal bony alignment due to abnormal healing,

poor postural awareness, and strength deficits to RTC, scapular stabilizers.

Tr 1022. She opined these "have made it difficult for [Plaintiff] to tolerate

use of the [left upper extremity], especially for reaching overhead/behind,

lifting, making it difficult to dond/doff shirts and have made it difficult for

[Plaintiff] to sleep." T. 1022. At a follow-up on November 6, Plaintiff reported soreness and was largely unchanged on examination. T. 1026-27. Extension was largely unchanged on November 8, and he was instructed on how to wear a sling. T. 1030-31. On November 12, findings were unchanged, but noticeable clicking and popping sounds were noted since the prior session. T. 1034-35. He followed up with soreness and was largely unchanged through November of 2020. T. 1038, 1044.

On December 4, 2020, Plaintiff returned to PT and reported similar symptoms; however, he believed he may have dislocated his shoulder while helping to prepare Thanksgiving dinner. T. 1048. He reported while preparing the turkey, it "slipped" and in reaching to catch it he felt his shoulder "go out." T. 1048. His examination was largely unchanged except that his range of motion was limited to 75 percent on abduction. T. 1049. He was unable to tolerate special testing. T. 1050.  During an orthopedic follow-up for his left shoulder, on December 18, 2020, Plaintiff again reported that he believed he reinjured it trying to reach and grab the turkey. T. 1081. He continued meloxicam. T. 1081. On examination, he was largely unchanged with obvious scapula winging, and reduced range of motion. T. 1112. He received a GH/ Methylprednisolone injection and was prescribed diclofenac. T. 1083, 1094, 1113.  On February 5, 2021, Plaintiff reported

that he received temporary relief from the injection, T. 1083, and his examination was essentially unchanged. T. 1115.  Restarting PT was recommended. T. 1116.

On May 18, 2021, at medication management meeting at UBMD/BestSelf, Plaintiff reported continued low back and left shoulder pain as well as reduced range of motion. T. 2041. On examination, left shoulder range of motion was limited to 90 degrees on abduction. T. 2042. Dr. Paner Bansi referred Plaintiff to Dent Neurology, after Plaintiff admitted to using marijuana and inquired about being prescribed medical marijuana to help with pain in the neck, low back, right hand, and knee. T. 2042. She also recommended he follow up with an orthopedist due to his rotator cuff impairment. T. 2042.

### 2.    Consultative Opinions

Plaintiff had a consultative examination with Susan Santarpia, Ph.D. on February 19, 2020. T. 466. Plaintiff reported that he had just started counseling, reported sleep difficulty, decreased appetite, depressive symptoms, dysphoric mood, loss of interest, and social withdrawal. T. 466. Dr. Santarpia opined Plaintiff had mild to moderate limitations interacting with others; sustaining concentration and performing a task at a consistent

pace; regulating emotions, controlling behavior and maintaining well-being; and being aware of normal hazards and taking appropriate precautions. T. 468.

In February of 2020, Plaintiff also had a consultative examination with Dr. Hongbiao Liu. T. 471. He reported body pain, hearing loss, and right-hand numbness. T. 471. On examination, right arm and right knee surgical scars were noted. T. 472. He was unable to perform hand flexion or extension, and had mild to moderate limitations to holding, zipping, buttoning, drying, and other fine manipulation with the right hand. T. 473. Dr. Liu opined to mild to moderate limitations in fine manipulation with the right hand. T. 474.  There was also moderate limitation in lifting, carrying, and overhead reaching with the right hand. T. 474.

On April 29, 2021, Dr. Daye, who was treating Plaintiff at General Physicians, PC, opined that Plaintiff had significant limitations with reaching. T. 1135. She opined Plaintiff could not do any reaching including overhead, with the left upper extremity. T. 1135. Plaintiff would also have good and bad days. T. 1135.

On August 19, 2021, Dr. Jennine Paner-Bansi, another treatment, diagnosed Plaintiff with PTSD, alcohol use disorder, cannabis use disorder,

tobacco use disorder, and polyarthralgia. T. 1138. She opined the Plaintiff was unable to engage in competitive employment. T. 1138. She noted his "PTSD results in mood changes that cause depression with inconsistent ability to make schedule appointments." T. 1138. She also noted that Plaintiff had left shoulder and lower back pain. T. 1138. His low back pain increased with standing, and his left shoulder pain increased with overhead reaching. T. 1138. Left shoulder range of motion was limited on abduction to 90 degrees. T. 1138. She noted anhedonia, sleep disturbance, decreased energy, feelings of guilt/worthlessness, concentration difficulty, vigilance, and recurrent recollections. T. 1139. She opined that in a workday, Plaintiff would be precluded from maintaining regular attendance and being punctual within customary tolerance by more than 20%; sustaining an ordinary routine without special supervision; working in proximity or coordination to others without being unduly distracted; and setting realistic goals or making plans independently of others. T. 1140. She also opined Plaintiff would be precluded from 11 to 20 percent of the day in other areas related to mental functioning. T. 1140. She opined he could stand 45 minutes at one time. T. 1141. In an eight-hour day, she opined he could stand/walk about two hours and sit over six hours. T. 1141. She opined he could not reach with the left arm. T. 1142. She opined he would

be off task 15 percent of the time and miss about three days per month. T. 1142. She further explained that "[d]ue to PTSD resulting in depression [and] inability to attend appoints which has occurred occasionally based off our records." T. 1142. She opined that while Plaintiff did have substance abuse impairment and Plaintiff would improve without substance abuse, he would only "improve somewhat" and "would still be unable to perform full-time work." T. 1143.

### 3.    **Plaintiff's Accident**:

On October 2, 2021, Plaintiff entered the Emergency Department (ED) at Erie County Medical Center (ECMC) ED after he was stuck by a car on his bicycle. T. 1145. He was combative initially and did admit to drinking alcohol. T. 1145. He had a deformity to the right ankle with a laceration, and diagnosis was an ankle fracture. T. 1153. He was found to have an open fracture int the talus and multiple fractures in the bilateral feet. T. 1162. He was subsequently admitted and underwent orthopedic surgery. T. 1162. At discharge, on October 8, he was unable to bear weight with the bilateral extremities and was sent to orthopedic rehab. T. 1162.  Plaintiff was admitted to Niagara Rehabilitation and Nursing Center after his hospital discharge, where he lived and attended rehab until December 2021. T. 1986-93.

On October 25, 2021, Plaintiff returned to the ED due to swelling, increased drainage, and increased pain. T. 1185, 1194. Rehab sent him to the ED after observing the foregoing symptoms. T. 1185. On examination, he had mild edema with a moderate amount of excoriation and drainage. T. 1186. He remained on Norco for pain. T. 1189. On evaluation, Dr. Mutty noted a possible infection. T. 1195. He informed Plaintiff to not use a CAM boot, and to remain non-weight bearing with only bearing weight through the heel for transfers, and to remain in wheelchair. T. 1192. He prescribed a course of antibiotics. T. 1192. He remained in the hospital and received an infectious disease evaluation the following day where he received IV antibiotics. T. 1199, 1203. He was discharged from the hospital on November 19, 2021. T. 1206-14. Just prior to his discharge, he underwent washout of the right lateral ankle wound with reversing of the peroneus breis muscle flap, and a skin graft. T. 1214.  As of November 27, 2021, Plaintiff was ambulating with a walker, though he still required two people for assistance getting out of a bed or chair. T. 1415.  Plaintiff was discharged from rehab on December 13, 2021. T. 1226-27.

At his hearing before the ALJ in this matter in January 2022, Plaintiff was still using a walker or a wheelchair and had a boot on his right ankle. T. 34. He remained on narcotic pain medication, taking Percocet. T. 34.

4.   **The ALJ's Decision**:

Applying the familiar five-step sequential analysis to determine

Plaintiff's disability status, the ALJ first determined that Plaintiff met the

insured status requirements of the Social Security Act through December

31, 2021. T. 147. The ALJ further found that Plaintiff had not engaged in

substantial gainful activity since his alleged onset date of November 5,

2018. T. 147.  At step 2, the ALJ concluded that Plaintiff had the following

severe impairments: degenerative joint disease of the right forearm and

right knee, and asthma. T.  147. The ALJ also determined that Plaintiff's

right ankle fracture was not severe. T. 148-49. At step three, the ALJ found

that these impairments did not meet or medically equal one of the listed

impairments set forth in Appendix 1 of 20 C.F.R. Part 404, Subpart P. T.

151. The ALJ then  determined that Plaintiff retained the RFC to perform

light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b) except he

could lift and/or carry 20 pounds occasionally and ten pounds frequently;

could stand and/or walk, with normal breaks, for a total of six hours per

eight-hour workday; and, could sit with normal breaks, for a total of six

hours per eight-hour workday. T. 151. Further, Plaintiff could frequently

handle or finger with the dominant right upper extremity and could tolerate

only occasional exposure to fumes, odors, dust, gases, and poor

ventilation. T. 152. At step four, the ALJ found that Plaintiff was unable to return to his past relevant work. T. 158. At step five, the ALJ considered Plaintiff's age, education, RFC, and past work experience, and relied on vocational expert testimony, to find that Plaintiff could make a successful adjustment to other work existing in the national economy. T. 158-59. Accordingly, the ALJ concluded Plaintiff was not disabled and denied his DIB and SSI claims. T. 159.

**5.** **Plaintiff's Claims:**

Plaintiff claims that the Commissioner's determination that he is not disabled is not supported by substantial evidence. Specifically, he alleges two errors which he claims warrant reversal of the ALJ's decision.  Dkt. 6-1, p. 1. First, Plaintiff contends that the ALJ erred at step two of his analysis in the way he assessed the severity and duration of Plaintiff 's bilateral foot impairments resulting from his October 2021 injury during which he was hit by a motor vehicle while riding his bicycle. Second, Plaintiff claims that the ALJ erred in purporting to find the physical consultative examination opinion persuasive but implicitly rejecting without explanation certain limitations from such opinion.  Dkt. 6-1, p.1.  Accordingly, Plaintiff asks this Court either to reverse or remand this matter to the Commissioner for further administrative proceedings.

## II.    LEGAL STANDARD

### A. Standard of Review

In reviewing a final decision of the SSA, a district court "is limited to determining whether the SSA's conclusions were supported by substantial evidence in the record and were based on a correct legal standard." *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012) (internal quotation marks and citation omitted). "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id*. It is not this Court's function to make a *de novo* determination as to whether the Plaintiff is disabled; rather, "the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn" to determine whether the SSA's findings are supported by substantial evidence. *Id*. The issue is not whether substantial evidence supports the Plaintiff's argument, but "whether substantial evidence supports the ALJ's decision." *Bonet ex rel. T.B. v. Colvin*, 523 Fed.Appx. 58, 59 (2d Cir. 2013) (italics omitted).

**B. Legal Standard to Determine Disability**

To determine whether a person claiming benefits is eligible under the Act, an ALJ must undertake a five-step sequential evaluation, determining: (1) whether the claimant is engaged in substantial gainful work activity; (2) whether the claimant has any "severe" impairments that significantly restrict his or her ability to work; (3) whether the claimant's impairments meet or medically equal the criteria of any listed impairments in Appendix 1 of Subpart P of Regulation No. 4 (the "Listings"), and if they do not, what the claimant's residual functional capacity ("RFC") is; (4) whether the claimant's RFC permits him to perform the requirements of his past relevant work; and (5) whether the claimant's RFC permits him to perform alternative substantial gainful work which exists in the national economy in light of his age, education, and work experience. *See Bowen v. City of New York*, 476 U.S. 467, 470-71 (1986); *Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999); *see also* 20 C.F.R. §§ 404.1520 and 416.920(a).

The ALJ has a "duty to investigate the facts and develop the arguments both for and against granting benefits." *Sims v. Apfel*, 530 U.S. 103, 111 (2000) (citation omitted). The ALJ need not, however, recite every piece of evidence that contributed to the decision so long as the record permits a reviewing court the ability to glean the rationale of the ALJ's

decision.   *Cichocki v. Astrue*, 729 F.3d 172, 178 n.3 (2d Cir. 2013).

"Although the claimant has the general burden of proving that he or she

has a disability within the meaning of the Act, because a hearing on

disability benefits is a non-adversarial proceeding, the ALJ generally has an

affirmative obligation to develop the administrative record." *Ubiles v. Astrue*,

No. 11-CV-6340T(MAT), 2012 WL 2572772, at *7 (W.D.N.Y. July 2, 2012)

(internal quotations omitted).

## III.   ANALYSIS

An impairment or combination of impairments is "severe" at Step Two

if it "significantly limits [the claimant's] physical or mental ability to do basic

work activities[.]" 20 C.F.R. § 404.1520(c). In contrast, an impairment is "not

severe" if the medical evidence clearly establishes it has no more "than a

minimal effect on an individual's physical or mental ability[ies] to do basic

work activities[.]" SSR 85-28, available at: 1985 WL 56856, at *3 (Jan. 1,

1985); see also *James C. v. Comm'r of Soc. Sec.*, 2020 WL 103813, at *4

(D. Vt. Jan. 9, 2020) ("An impairment is 'not severe' when medical evidence

establishes 'only a slight abnormality ... [,] which would have no more than

a minimal effect on [the claimant's] ability to work.' ") (alterations in original)

(quoting SSR 85-28, 1985 WL 56856, at *3).

Whether an impairment is "severe" also has a durational component: "Unless [a claimant's] impairment is expected to result in death, it must have lasted or must be expected to last for a continuous period of at least [twelve] months." 20 C.F.R. § 404.1509. See, *William B. v. Comm'r of Soc. Sec.*, No. 20-CV-6511S, 2022 WL 278180, at *3 (W.D.N.Y. Jan. 31, 2022). "It is the Plaintiff's burden to show at step two that he has a 'severe' impairment or combination of impairments." *Id.* (alterations omitted).

Here, at step two, the ALJ also found Plaintiff 's "right ankle fracture" to be non-severe. T. 148-49. In so doing, the ALJ provided the following explanation:

> I must determine whether or not this impairment is going to be severe for the purpose of this decision. In short, I must consider whether or not this impairment is going to last at a significant level for at least 12 months to therefore satisfy the above-cited duration requirement. 20 CFR 404.1509 and 404.1522; 416.909 and 416.922. While the claimant did have two hospitalizations after the injury, including one for complications which then required inpatient rehabilitation, I still conclude that the impairment is expected to heal within 12 months. There is no written expectation from a medical provider in this file that the impairment is considered to not be able to heal within the 12-month duration. Therefore, I conclude that the recent right ankle fracture has not yet demonstrated that it satisfies the severity standard. T. 148-49.

First, the ALJ's characterization of Plaintiff's injury as merely a "right ankle fracture" is incomplete. While Plaintiff did have a fracture in the right

ankle in the Talus bone, the medical records submitted by Plaintiff to the ALJ also reveal that Plaintiff also sustained right hindfoot fractures, as well as left forefoot fractures because of the October 2021 accident.  T. 1192. In addition, Plaintiff had an ulcer on the dorsal aspect of the left forefoot. T. 1192. Plaintiff was initially instructed to wear a CAM walker boot on his left lower extremity, but Dr. Mutty discontinued this to relieve pressure. T. 1192. Further,  Plaintiff was required to undergo additional surgery following an infection and was also  required to obtain a skin graft.  T. 1214.

Although the ALJ did discuss—albeit incompletely—the injury, hospitalization, and rehabilitation, see, T. 148, he simply observed that "[t]here is no written expectation from a medical provider in this file that the impairment is considered to _**not be able to heal within the 12-month duration**_." T.148-149 (emphasis supplied).  While the foregoing statement may be true, its inverse—i.e., "[t]here is no written expectation from a medical provider in this file that the impairment is considered **to be able to heal within the 12-month duration**"—is also true.  Quite simply, the absence of any medical or opinion evidence regarding the lasting effects and expected duration of the impairments Plaintiff sustained in the October 2021 accident amounts to a gap in the record.  This Court determines that the ALJ's decision affirmatively to rely upon that gap in the evidence to

support his conclusion Plaintiff's most recent impairments would heal within 12 months was error.

Although a "claimant has the general burden of proving that he or she has a disability within the meaning of the Act, ... '[b]ecause a hearing on disability benefits is a nonadversarial proceeding, the ALJ generally has an affirmative obligation to develop the administrative record.' " *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) (alteration in original) (first citing *Draegert v. Barnhart*, 311 F.3d 468, 472 (2d Cir. 2002); and then quoting *Melville v. Apfel*, 198 F.3d 45, 51 (2d Cir. 1999)); see also *Tankisi v. Comm'r of Soc. Sec.*, 521 F. App'x 29, 33 n.1 (2d Cir. 2013) ("Unlike a judge at trial, the ALJ has a duty to 'investigate and develop the facts and develop the arguments both for and against the granting of benefits.' " (quoting *Vincent v. Comm'r of Soc. Sec.*, 651 F.3d 299, 305 (2d Cir. 2011))).

This duty is present "[e]ven when a claimant is represented by counsel." *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009) (collecting cases); see also *Eusepi v. Colvin*, 595 F. App'x 7, 9 (2d Cir. 2014) ("[T]he ALJ's general duty to develop the administrative record applies even where the applicant is represented by counsel...."); *Rockwood v. Astrue*, 614 F. Supp. 2d 252, 279 (N.D.N.Y. 2009) ("[A]n ALJ has an affirmative duty to develop the record, even if the claimant is represented by counsel, if the

medical record is ambiguous or incomplete." (first citing *Tejada v. Apfel*, 167 F.3d 770, 774 (2d Cir. 1999); and then citing *Rosa v. Callahan*, 168 F.3d at 79 (2d Cir. 1999))).

In addition, the ALJ must attempt to fill gaps in the record. See *Rosa*, 168 F.3d at 79 & n.5 (explaining that the ALJ must attempt to fill "clear gaps" in the record, but "where there are no obvious gaps ... and where the ALJ already possesses a 'complete medical history,' " the ALJ is under no obligation to seek additional information (quoting *Perez v. Chater*, 77 F.3d 41, 48 (2d Cir. 1996))); *Doria v. Colvin*, No. 14-CV-7476, 2015 WL 5567047, at *7 (S.D.N.Y. Sept. 22, 2015) ("The ALJ's duty to develop the record includes a duty to resolve apparent ambiguities relevant to the ALJ's disability determination."). Indeed, "[t]he failure to develop the record cannot be harmless error [where] the ALJ relied on perceived gaps in the medical evidence to find Plaintiff not disabled." *Ubiles v. Astrue*, No. 11-CV-6340T, 2012 WL 2572772, at *10 (W.D.N.Y. July 2, 2012).

Here, the Court concludes that in the face of what certainly appears to be a significant injury—one that required months of inpatient rehabilitation and one which months after its occurrence significantly impaired Plaintiff's mobility at the hearing—the ALJ erred by relying on his own lay interpretation of raw medical data to make a finding that the ankle

and foot impairments that Plaintiff sustained as a result of such injury would not last 12 months. T. 148-49.  See, *Brittney B. v. Comm'r of Soc. Sec.*, No. 21-CV-686-FPG, 2022 WL 4920902, at *2 (W.D.N.Y. Oct. 4, 2022) ("While an ALJ may render common sense judgments about functional capacity, she must avoid the temptation to play doctor." (citation and quotation omitted)).  Beyond relying upon his lay analysis of the limited medical records to assess the "severity" of Plaintiff's injuries to his lower extremity, the ALJ further erred, as the Court has already noted, by failing to develop the record by obtaining a medical consultant to examine Plaintiff and assess the extent and duration of any work-related physical limitations resulting from the injury.  See, e.g., *Cathy G. v. Kijakazi*, No. 1:21-CV-823 (ATB), 2022 WL 11134065, at *9 (N.D.N.Y. Oct. 19, 2022)(concluding that the "ALJ inappropriately applied his lay analysis to the limited medical records to assess 'severity' of plaintiff's … impairments. He further erred by failing to develop the record by obtaining a medical consultant to examine [plaintiff] and assess [plaintiff's] work-related … limitations.").

For the foregoing reasons, the Court concludes that the case should be remanded for the purpose of further developing the record regarding the nature and duration of the impairments created by Plaintiff's October 2021 accident.   Because "the Court has already determined, for the reasons

previously discussed, that remand of this matter for further administrative proceedings is necessary, the Court declines to reach the second claim of error raised by Plaintiff.  <u>See</u>, *Deborah O. L. v. Comm'r of Soc. Sec.*, No. 1:19-CV-00860 EAW, 2021 WL 671598, at *4 (W.D.N.Y. Feb. 22, 2021); <u>see also</u>, *Raymond v. Comm'r of Soc. Sec.*, 357 F. Supp. 3d 232, 240-41 (W.D.N.Y. 2019) (declining to reach arguments concerning whether ALJ's findings were supported by substantial evidence where the court had already determined that remand was necessary).

## IV.    CONCLUSION

For the foregoing reasons, Plaintiff's motion for judgment on the pleadings (Dkt. # 6) the is **GRANTED**, to the extent that this matter is remanded to the Commissioner for further administrative proceedings consistent with this Decision and Order.  The Commissioner's motion (Dkt. # 11)  is **DENIED**.

**IT IS SO ORDERED**.

*s/Richard J. Arcara*
HONORABLE RICHARD J. ARCARA
UNITED STATES DISTRICT COURT

Dated:  November 7, 2025
    Buffalo, New York